UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

IN RE:      MDL CASE NO.: 8:05-MD-1656-T-27TBM

CP SHIPS LTD.,      CASE NO.: 8:04-CV-1895-T-27TBM
SECURITIES LITIGATION     8:04-CV-1949-T-27TBM
    8:04-CV-2140-T-27TBM
    8:05-CV-492-T-27TBM
_____/     8:05-CV-495-T-27TBM
    8:05-CV-849-T-27TBM
    8:05-CV-1919-T-27TBM

## ORDER

**BEFORE THE COURT** is Defendants' Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint (Dkt. 34), to which Plaintiffs have responded in opposition (Dkt. 36). The Court heard oral argument on January 27, 2006. (Dkts. 52, 82).[1] Upon consideration, Defendants' motion to dismiss is GRANTED, with leave to amend.

### *Background*

Plaintiffs filed their Consolidated Amended Class Action Complaint (Dkt. 31) alleging violations of §§ 10(b) and 20(a) of the Exchange Act. In the instant motion, Defendants move to dismiss the Amended Complaint (Dkt. 31) pursuant to Fed. R. Civ. Pro. 9(b) and 12(b)(6), as well as the Private Securities Litigation Reform Act ("PSLRA"), arguing that Plaintiffs fail to allege scienter with the requisite level of particularity. The pertinent allegations are set forth below.

Defendant CP Ships, LTD. ("CP Ships") is a non-U.S. corporation with its principal place of business in Tampa, Florida. (Dkt. 31, ¶ 20). CP Ships is a container shipping company that provides international transportation of industrial and consumer goods for approximately 23,700

---

[1] Although the motion to dismiss was originally filed on August, 9, 2005, the parties stipulated to a stay of proceedings, effective March 3, 2006, to conduct settlement negotiations. (Dkts. 60, 62). At the parties' request, the case was reopened on November 14, 2006. (Dkt. 84).

customers worldwide. (Dkt. 31, ¶¶ 20, 32). Lead Plaintiffs filed this action on behalf of purchasers of CP Ships securities between January 29, 2003 and August 9, 2004 ("the class period"). (Dkt. 31 ¶ 1). Defendant Ray Miles was the President, Chief Executive Officer (CEO), and member of the Board of the Company during the class period. (Dkt. 31, ¶ 21). He became Chairman in May 2004, when Defendant Frank Halliwell was appointed CEO. (*Id.*) Before becoming CEO, Halliwell was Chief Operating Officer (COO) and a director and member of the executive committee during the class period. (Dkt. 31, ¶ 23). Defendant Ian Webber was Chief Financial Officer (CFO) during the class period. (Dkt. 31, ¶ 22).

*1.   Alleged misrepresentations and corrective disclosures*

Plaintiffs allege that Defendants made numerous misrepresentations during the class period regarding CP Ships' profits and cost savings, when, in fact, CP Ships' costs were being regularly under-accrued. For instance, on January 29, 2003, CP Ships announced a $34 million profit for the fourth quarter 2002, which was attributed, in part, to "significant cost reduction." (Dkt. 31, ¶¶ 71, 72). This filing was certified by Miles and Webber. (Dkt. 31, ¶¶ 75-76). On April 7, 2003, Defendants filed their 2002 year end results with the SEC, reporting operating income of $83 million and again citing "significant cost reduction." (Dkt. 31, ¶ 74). On July 21, 2003, Defendants announced that profits for second quarter 2003 were double the profits for second quarter 2002, due in part to lower ship network costs. (Dkt. 31, ¶ 82). On October 29, 2003, Defendants announced that operating profits were up 29% for the third quarter 2003. (Dkt. 31, ¶ 87). On February 5, 2004, Defendants announced $100 million in cost reductions and a $49 million profit for the fourth quarter 2003. (Dkt. 31, ¶ 92). On April 15, 2004, Defendants released their 2003 year end results, reporting operating income of $131 million and citing "cost savings." (Dkt. 31, ¶¶ 96-97). This form was signed by each individual defendant. (Dkt. 31, ¶ 96).

On May 11, 2004, however, Defendants announced a "one-off and non-recurring" $8 million

2

downward restatement of reported 2003 net income. (Dkt. 31, ¶¶ 7, 107). During a conference call, Miles stated that the revision did not affect the first quarter 2004. (Dkt. 31, ¶¶ 110). On May 19, 2004 and May 26, 2004, Miles sold stock options and shares for a profit of approximately $3.85 million. (Dkt. 31, ¶ 134). Between May 20, 2004 and June 4, 2004, three other non-defendant executives also sold shares for profits of $26,806.00, $25,681.71, and $175,528.73, respectively. (Dkt. 31, ¶ 137).

On August 9, 2004, Defendants announced that the implementation of their new SAP accounting system revealed insufficient accruals for certain costs. (Dkt. 31, ¶ 9).[2] Defendants estimated that 2003 reported profits would be reduced $22 million to $27 million, in addition to the earlier $8 million downward revision. (Dkt. 31, ¶ 9). Defendants also estimated that 2002 net income would be reduced by $7 million, and that the first quarter 2004 net income would be reduced by $6 million. (Dkt. 31, ¶ 9). Immediately following this announcement, shares of CP Ships' stock fell $3.70 per share, a 22.4% decline. (Dkt. 31, ¶ 10). On August 16, 2004 Defendants announced the actual restatement figures, which totaled $41 million. Specifically, 2003 income was revised down by $29 million, 2002 income was revised down by $7 million, and first quarter 2004 income was revised down by $5 million. (Dkt. 31, ¶ 12).

2.  *Scienter*

Plaintiffs' allegations of scienter are premised on statements by twelve confidential sources ("CS"). The names of the sources are not disclosed, but their position and time at the company is alleged in general terms. (Dkt. 31, ¶ 14). Essentially, Plaintiffs allege, based on these sources, that Defendants received detailed cost information through a variety of channels and were therefore severely reckless in not realizing that there were cost under-accruals, or that they had actual

---

[2] During 2003 and January 2004, CP Ships implemented a SAP accounting system. (Dkt. 31, ¶ 4). During the implementation, CP Ships also ran its prior accounting system. (*Id.*)

knowledge of cost under-accruals.

According to CS-1, a former accounting employee, Halliwell and other unidentified executives received weekly Cost Per Teu Reports, which included the components used to measure this cost. (Dkt. 31, ¶ 45). CS-1 also states that executives received various other weekly, bimonthly, or monthly reports, including a Fleet Report, a Risk Management Report, and a Vessel Option Periods Report. (Dkt. 31, ¶ 47). Plaintiffs allege that the executives tracked critical costs such as fuel consumption, which was one of the highest profile costs in the company, and exchange rates. (Dkt. 31, ¶¶ 48-51). For instance, CS-3, a former accounting supervisor, states that the manager of cost reporting made monthly reports to Halliwell and Webber on fuel costs, including whether the fuel consumption exceeded or was less than budget, as well as on other budget costs. (Dkt. 31, ¶¶ 53-54). According to CS-9, who worked in a variety of planning, design, analysis, and other positions, Halliwell was a micro-manager who looked at "every number." (Dkt. 31, ¶ 69). CS-3 states that after receiving monthly reports, Halliwell would complain about the figures and that the manager of cost accounting would say that he had to change the reports. (Dkt. 31, ¶ 55).

CS-2, a former accounting department financial analyst, states that "when estimating fuel charges and other expenses for accrual purposes, there were always under-accruals of the actual costs" and that s/he was "forbidden by management" from speaking to the providers of the relevant accrual numbers. (Dkt. 31, ¶ 63). CS-3 states that payments to vendors were often delayed because of low cash flow and that Halliwell and Webber were aware of these late payments. (Dkt. 31, ¶ 59). CS-9 states that different companies within CP Ships did not want to own costs, so the costs were moved from one division to another. (Dkt. 31, ¶ 70). Although Defendants publicly attributed the under-reporting to errors in the conversion to the SAP accounting system, Plaintiffs allege that this was merely an excuse for the under-reporting. (Dkt. 31, ¶ 68). For instance, CS-3 states that when one or two million dollars appeared to be missing, "in the end, we would write everything off to

SAP." (*Id.*)

Plaintiffs allege that the Defendants violated several Generally Accepted Accounting Principles (GAAP). (Dkt. 31, ¶¶ 143-53). They also allege that this under-reporting was motivated by several goals: to raise money in securities offerings, to allow Miles and other executives to profit from their sales of stock at artificially inflated prices; to allow the individual defendants to profit from bonuses tied to stock performance; and to facilitate the negotiation of favorable terms for a new $525 million facility. (Dkt. 31, ¶¶ 13, 130).

### *Standards*

A court may grant a motion to dismiss "only when the defendant demonstrates beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Chepstow Ltd. v. Hunt*, 381 F.3d 1077, 1080 (11th Cir. 2004) (internal quotation omitted). A court will accept as true all well pled factual allegations and will view them in a light most favorable to the nonmoving party. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984). In considering a motion to dismiss, the court is generally confined to examining the four corners of the complaint, but the court may take judicial notice of relevant documents publicly filed with the Securities Exchange Commission ("SEC"). *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1287 (11th Cir. 1999).

Notwithstanding the low threshold for surviving a motion to dismiss, Congress imposed heightened pleading requirements for claims alleging violations of section 10(b) and Rule 10b-5 through passage of the PSLRA. 15 U.S.C. § 78u-4(b)(1); *Harris v. Ivax Corp.*, 182 F.3d 799, 803 (11th Cir. 1999). To state a cause of action under Section 10(b) or Rule 10b-5, Plaintiffs are required to allege "(1) a misstatement or omission (2) of a material fact (3) made with scienter (4) upon which the plaintiff relied (5) that proximately caused the plaintiff's loss." *Theoharous v. Fong*, 256 F.3d 1219, 1224 (11th Cir. 2001)(*internal citation omitted*). In their Amended Complaint, Plaintiffs must

"specify each statement alleged to have been misleading, [and the] reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). Under Fed. R. Civ. P. 9(b), a plaintiff must allege fraud with particularity. Rule 9(b) requires a plaintiff to allege the precise statements, documents or representations made; the time, place and person responsible for the statements; the content and manner in which the statements misled plaintiff and what defendant gained by the alleged fraud. *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1380 (11th Cir. 1997).

The PSLRA requires that scienter be pled with particularity. With respect to each act or omission, Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). This requirement "alters the usual contours of a Rule 12(b)(6) ruling because, while a court continues to give all reasonable inferences to plaintiffs, those inferences supporting scienter must be strong ones." *Garfield v. MDC Health Corp.*, 466 F.3d 1255, 1264 (11th Cir. 2006). In the Eleventh Circuit, "a complaint alleging with particularity that a defendant acted with a severely reckless state of mind" states a claim under the PSLRA. *Bryant*, 187 F.3d at 1283. Severe recklessness includes "highly unreasonable omissions or misrepresentations" that involve "an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Id.* at 1282, n. 18. Scienter may be inferred from the aggregation of all alleged particularized facts in the complaint. *Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1017 (11th Cir. 2004). However, it must be found with respect to each defendant and with respect to each alleged violation fo the PLSRA. *Id.* at 1017-18.

### *Discussion*

Pursuant to *Scientific-Atlanta*, scienter allegations relating to each claimed misstatement must be viewed in conjunction with Plaintiffs' overarching allegations that: (1) Defendants, especially

Halliwell, monitored costs at the company through regular reports; (2) Defendants certified certain SEC filings as accurate, although the filings violated GAAP; (3) the $41 million restatement was considerable when compared to CP Ships' net income; and (4) Miles and three non-defendant executives sold stock at a substantial profit three months before the bulk of restatement was announced in August 2004. As discussed below, Plaintiffs' allegations, even when considered in the aggregate, are not sufficiently particularized and therefore do not support the requisite strong inference of scienter.

Plaintiffs have alleged that Defendants monitored the costs of the company through various reports, including a Cost Per Teu Report. In two of the paragraphs most frequently cited by Plaintiffs in their opposition brief, the Amended Complaint alleges:

> 55. CS-3 further reported that: After receiving the monthly reports from the manager of cost accounting, Halliwell would sometimes come downstairs to cost accounting and complain: "These figures have to be wrong. Check them again." The manager of cost accounting then needed to revise the figures. Sometimes, the manager of cost accounting would need to go upstairs, to hear Halliwell make the same complaint. CS-3 would run into the manager of cost accounting in the elevator afterwards, and the manager would say: "I have to change the reports. Halliwell didn't like the numbers."
>
> 63. Although Defendants knew or recklessly disregarded the actual costs that were being incurred, Defendants permitted the accrual figures, for accounting purposes, to be understated. CS-2 a former CP Ships accounting department financial analyst relayed that, when estimating fuel charges and other expenses for accrual purposes, there were always under-accruals of the actual costs. Moreover, CS-2 was forbidden by management from sitting down with the people in the various groups which provided CS-2 with the expense accrual numbers, but just had to accept them. CS-2 also complained to CS-2's manager about the cost estimates used for accruals. CS-2 further explained that s/he was "not the only one to complain" about this in the accounting department. (Dkt. 31, ¶ 55, 63).

These allegations do not possess the requisite particularity. Paragraph 63 fails to explain the statement that there were "always" under-accruals and that unidentified persons in "management"

forbid CS-2 from talking to other departments. Plaintiffs have not alleged facts regarding the subject matter of the under-accruals, the manner in which they were accomplished, the timing, and most importantly, who directed it and how it was directed. *Garfield*, 446 F.3d at 1264, n.7, 1265 (allegations of statements were insufficient where they failed to alleged "what was said at the meeting, to whom it was said, or in what context"); *In re Sunterra Corp. Sec. Litig.*, 199 F. Supp. 2d 1308, 1325 (M.D. Fla. 2002) (allegations that emails were sent to individual defendants warning of improper revenue recognition were insufficient evidence of scienter where they did not describe "the content of the message, who sent it, or why it was reliable"). Similarly, Paragraph 55 is devoid of any allegation that Halliwell did anything other than complain about the numbers.[3] Indeed, Plaintiff alleges that computer mistakes did occur and that Halliwell knew when these cost reports were wrong due to computer problems. (Dkt. 31, ¶ 56).

Furthermore, there is no allegation, let alone a detailed allegation, that the Defendants were confronted about a practice of under-accruing costs or that they discussed such a practice. *Compare In re Sunbeam*, 89 F. Supp. 2d 1326, 1338 (S.D. Fla. 1999) (finding scienter was pled where the complaint alleged, among other facts, that two defendants were "directly confronted" about revenue recognition practices and detailed the instances where the manipulation of financial results was discussed and joked about); *In re Catalina Marketing Corp. Sec. Litig.*, 390 F. Supp. 2d 1110, 1115

---

[3] In their opposition brief, while complaining that "Defendants mischaracterize the Complaint," Plaintiffs themselves take liberties with and mischaracterize the allegations of the Amended Complaint. (Dkt. 36 at 4, 12, 13, 14). For example, at page one of their brief, Plaintiffs argue that ". . . employees were instructed, sometimes by the Individual Defendants, to change cost reports and use deliberate under-accruals of costs." No such allegation can be found in the Amended Complaint. Referencing Paragraph 55 of the Amended Complaint, at page four, Plaintiffs argue that "Halliwell frequently demanded that the manager of cost accounting 'change' the monthly cost reports because Halliwell 'didn't like the numbers.'" At page twelve, Plaintiffs argue that Halliwell "frequently demanded that the manager of cost-accounting 'change' the monthly cost reports . . . ," again referencing Paragraph 55 of the Amended Complaint. However, Paragraph 55 contains no such allegations. Referencing Paragraph 68 of the Amended Complaint, Plaintiffs argue that "[e]mployees were also encouraged to falsely blame cost discrepancies on the SAP conversion." There is no such allegation in Paragraph 68. Counsel are cautioned that such tactics are not viewed favorably by the Court.

(M.D. Fla. 2005) (complaint alleged that defendants were "regularly confronted" with declining sales and "personally warned" of the impending earnings miss); *with In re Sunterra Corp. Sec. Litig.*, 199 F. Supp. 2d at 1329-30 (allegations that defendant "initiated policies whereby canceled contracts or otherwise uncollectible mortgage receivables were not removed from the books" was too conclusory).

Plaintiffs' theory that Defendants must have known of the cost under-accruals because of internal reports that the executives used to keep current on the day-to-day operations "would result in an inference of scienter being available in any case in which a company with a reporting system fails to meet forecasted revenues," or issues a restatement of income. *Bryant v. Avado Brands, Inc.*, 100 F. Supp. 2d 1368, 1379 (M.D. Ga. 2000), *rev'd on other grounds*, 252 F.3d 1161 (11th Cir. 2001). In the end, Plaintiffs have failed to include any allegation showing that the internal reports were accurate and that Defendants actually knew that their public statements contradicted the correct numbers, or were severely reckless in making these statements. *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 432-33 (5th Cir. 2002) (absent allegation that corporate reports were contrary to released information, there was no scienter). Plaintiffs' allegations simply do not support a strong inference of severe recklessness or actual knowledge of fraud.

Plaintiffs have also argued that the Defendants' certification of the accuracy of CP Ships' SEC filings demonstrates scienter. However, the Eleventh Circuit has specified that "a Sarbanes-Oxley certification is only probative of scienter if the person signing the certification was severely reckless in certifying the accuracy of the financial statements." *Garfield*, 466 F.3d at 1266. This requirement is met when the person has "reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions." *Id.*

Plaintiffs conclusorily allege that Defendants engaged in several GAAP violations and a violation of FASB 5, but fail to allege any facts explaining these allegations. (*See* Dkt. 31, ¶¶ 148-151). *Compare Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1208 (11th Cir. 2001) (finding plaintiffs failed to allege any tips, letters, or conversations or other facts indicating severe recklessness); *In Re AFC Enter., Inc. Sec. Litig.*, 348 F. Supp. 2d 1363, 1372 (N.D. Ga. 2004) (noting that GAAP violations were errors in accruals, not attempts to fabricate revenue or conceal expenses); *with In re MicroStrategy, Inc. Sec. Litig.*, 115 F.Supp.2d 620, 635-36 (E.D.Va. 2000) (finding adequate allegations of scienter where complaint alleged "in some detail the magnitude of the restated financials and the pervasiveness and repetitiveness of MicroStrategy's GAAP violations; the simplicity of the accounting principles violated in this case; and the importance of the contracts involved."); *In re Catalina Marketing Corp. Sec. Litig.*, 390 F. Supp. 2d at 1115 (complaint alleged two methods by which financial statements were manipulated).

Plaintiffs also rely on the amount of the August 2004 restatement. Specifically, they allege that first quarter 2004 net income was overstated by 62% ($5 million), 2003 net income was overstated by 35% ($29 million), and 2002 net income was overstated by 13% ($7 million). (Dkt. 31, ¶ 142). The restatements for 2003 and first quarter 2004 are not inconsiderable when compared to CP Ship's net income. However, those amounts are not "glaringly obvious" as they involve less than 1% of total revenues. *In Re AFC Enter., Inc. Sec. Litig.*, 348 F. Supp. 2d at 1373 n.3 (noting that 50% overstatement of net income was not glaringly obvious where it was less than 1% of revenues); *cf. In re Catalina Marketing Corp. Sec. Litig.*, 390 F. Supp. 2d at (overstatement of income of 43% *supports* an inference of scienter); *Zukerman v. Smart Choice Auto. Group, Inc.*, No. 6:99-CV-237, 2000 WL 33996254 at *2 (M.D. Fla., Aug. 29, 2000) (instead of previously reported

net income of $4.6 million company had a net loss of $6.9 million).[4] The issuance of a restatement, even involving a considerable change in numbers, cannot support a securities fraud lawsuit, absent other evidence of scienter.

Finally, Plaintiffs' allegations of motive and opportunity are insufficient to support the requisite inference of scienter. Miles' stock sales, which occurred shortly after the May 2004 restatement and three months before the August 2004 restatement, do not, in and of themselves, give rise to a strong inference that he acted with scienter, given the absence of any specific allegations of Miles' involvement in the alleged fraud.[5] Furthermore, the two principal insiders described in the Amended Complaint, Halliwell, the COO and CEO, and Webber, the CFO, are not alleged to have made any suspicious stock trades or sales. *Bryant*, 100 F. Supp. 2d at 1385 (trades by three individual defendants did not support a strong inference of scienter where two principal insiders did not make trades); *Abrams*, 292 F.3d at 435 (sale by one defendant is not a strong inference where other defendants do not sell shares during class period). Similarly, generic allegations that defendants were motivated to raise capital for the company and to obtain bonuses for themselves are unavailing. If such allegations were sufficient to demonstrate scienter, every executive and corporation would be exposed to liability. *Abrams*, 292 F.3d at 434.

This Court recognizes the need to consider an inference that may be drawn when all of Plaintiffs' allegations are considered in the aggregate. These allegations, however, lack the particularity mandated by the PLSRA and fail to raise the necessary *strong* inference that Defendants engaged in "highly unreasonable omissions or misrepresentations" that involved "an extreme

---

[4] Plaintiffs argue that "[t]he focus on revenue, an old chestnut that securities fraud defendants frequently try on judges and juries, is entirely specious. What matters most to investors is income, not revenues . . . ." *Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 18 (D. Mass. 2004).

[5] As Plaintiffs point out, during an August 16, 2004 conference call, Webber stated that the cost accrual problem did not become apparent until June 2004. (Dkt. 31, ¶ 120). There is no support in the pertinent allegations of the Amended Complaint for Plaintiffs' contention that Miles, or the other defendants, knew of the need for the restatement when their stock sales were made. (Dkt. 36 at 19-20).

11

departure from the standard of ordinary care." *Bryant*, 187 F.3d at 1282 n.18. Halliwell's and Webber's receipt of company reports and Halliwell's statements that he did not like the reported numbers do not lead to a strong inference that Defendants acted with the requisite severe recklessness or actual knowledge of cost under-accruals. Plaintiffs reliance on generic allegations of GAAP violations, the size of the restatement, and Defendants' alleged motives are not sufficient without more. These allegations, even taken in the aggregate, do not meet the heightened pleading requirement of the PLSRA. *See. e.g., Bryant*, 100 F. Supp. 2d 1368 (finding scienter was not adequately pled on facts similar to the instant case).

***Plaintiffs State a Claim under § 20(a) against Individual Defendants***

The Individual Defendants move to dismiss Count II of the Complaint, in which Plaintiffs assert that they are liable as controlling persons under § 20(a) of the Exchange Act. As the Court has concluded that the Amended Complaint fails to state a claim against CP Ships under § 10(b), Defendants' motion to dismiss Count II is due to be granted. *Theoharous*, 256 F.3d at 1227.

Accordingly, it is

**ORDERED AND ADJUDGED** that Defendant's Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint (Dkt. 34) is **GRANTED**. Plaintiffs are granted leave to file an amended complaint within forty-five (45) days of the date of this Order.

**DONE AND ORDERED** in chambers this 5th day of April, 2007.

JAMES D. WHITTEMORE
**United States District Judge**

Copies to:
Counsel of Record